1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHN ERIC CHATMON,

11              Plaintiff,                    No. CIV S-05-2083 FCD EFB P

12        vs.

13   DOYLE, et al.,

14              Defendants.              <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16        Plaintiff is a state prisoner proceeding *pro se* and *in forma pauperis* with a civil rights

17   action pursuant to 42 U.S.C. § 1983.  His complaint, filed October 18, 2005, alleges that

18   defendants violated his rights under the Eighth Amendment by denying him adequate medical

19   care and nutrition, using excessive force, exposing him to an unreasonable risk of harm, and

20   harassing him sexually.  Before the court is defendants' motion for summary judgment, filed

21   August 13, 2007.  For the reasons set forth below, the court recommends that defendants' motion

22   for summary judgment be granted.

23   **I.      Facts**

24        **A.  Mental Health Care Given to Plaintiff at High Desert State Prison**

25        Plaintiff arrived at High Desert State Prison (HDSP) on November 19, 2003, from a

26   reception center where he was found to be mentally ill and refusing medications.  Defs.' Mot. for

1

Summ. J., Ex. B, at 3; Ex. B, Attach. 1, at 19.  He was seen by mental health staff at HDSP on arrival and reported that he was doing "OK" without medication, so none was ordered.  Ex. B, Attach. 1, at 4.

When defendant Dennis saw plaintiff in late May 2004, plaintiff  told mental health staff that the last time he had taken medication for his mental illness was between July and October 2003, that he was not overtly psychotic at that time, but was paranoid.  *Id.*, at 10.  He was retained at the Correctional Clinical Case Management Services (CCCMS) level of care and scheduled to be seen every 90 days.  *Id*.

After plaintiff had a fight with his cellmate in June 2005, plaintiff told mental health staff that he had problems with cellmates generally, that staff were plotting against him, and that he did not trust anyone.  Ex. B, Attach. 1, at 29.  Mental health staff followed him on a regular basis and recommended in September 2004 that he be separated from a cellmate

In January 2005, custody staff referred plaintiff to mental health staff for suicidal ideation after he asked for a razor because his was dull, though he denied wanting to cut his throat with it.  Ex. B, Attach. 1, at 65, 67-68.  Plaintiff told mental health staff that he was only trying to get a razor to shave and denied that he intended to cut his throat.  *Id*.  Mental health staff found he was not suicidal and allowed him to return to his housing unit.  *Id*.  Plaintiff subsequently told a classification committee that he did not want a cellmate, but the committee noted no factors that precluded him from having one.  Defs.' Mot. for Summ .J., Ex. A, Attach. 1, at 26.

On February 21, 2005, mental health staff noted that plaintiff was paranoid about custody staff and believed they were persecuting him because of frequent complaints he had made.  Ex. B, Attach. 1, at 71, 108.  He was noted to have a history of frequent, vague, and non-specific medical complaints and health-seeking behavior.  *Id*.  Plaintiff said he was unhappy with his cellmate because of his poor hygiene, but mental health staff noted that officers had responded to the problem by referring the cellmate to them for poor hygiene on two occasions.  *Id*.

////

1    Plaintiff was moved to the Correctional Treatment Center (CTC) for suicidal ideation

2    after he refused to contract for his safety.  *Id*.  Mental health staff noted that he felt he was

3    entitled to special treatment because of perceived mistreatment, and that he was trying to

4    manipulate staff into transferring him from HDSP by threatening in a general way to hurt himself

5    or others.  *Id*.  Plaintiff told mental health that he would refuse to go back to Facility D yard

6    because he claimed he would be "in jeopardy" there.  *Id*.

7    Plaintiff was discharged from the CTC on February 28, 2005, with a diagnosis of

8    adjustment disorder and antisocial personality disorder.  Ex. B, Attach. 1, at 86.  Mental health

9    staff noted that he was unwilling to take advice about how to handle his problems and was

10   threatening to harm himself, if he was returned to his cell and not given special housing.  *Id.,* at

11   93, 99.  After returning to his cell, plaintiff broke the fire suppression system and flooded the cell

12   after Officer Wojick refused to given him a razor when he saw plaintiff picking his wrist with a

13   paper clip.  *Id*., at 43.  Plaintiff  said his cellmate was "crazy" and that he was "tired of his shit."

14   *Id*.

15   The same day, plaintiff was re-admitted to the CTC because he had threatened suicide

16   again by scratching his wrist.  Ex. B, at 123, 135, 142.  Mental health staff noted that he had a

17   history of reporting being threatened on the yard, but that he had never identified any specific

18   inmate or threat to support his claim.  *Id*., at 135.  A Band-Aid was applied to the scratch on

19   plaintiff's wrist, and mental health staff concluded that the scratching was a manipulative

20   gesture.  *Id*.  Plaintiff's counselor interviewed him about the alleged threat to his safety, could

21   not confirm his information, and concluded that he was being manipulative in order to obtain a

22   housing change.  Ex. A, at 46.

23   In spite of the absence of evidence of an actual threat, custody staff gave plaintiff a new

24   cellmate to get him away from the one he disliked.  *Id*.  Plaintiff subsequently told Dr. Dennis

25   that he was getting along with the new cellmate, who kept the cell clean, and was older and not

26   gang-affiliated.  Ex. B, at 159.

Three weeks later, however, plaintiff asked a psychiatric technician for a paper clip, saying he was not getting along with officers and that he wanted to be moved to the Enhanced Outpatient Program ("EOP"). Ex. B, at 164. The paper clip was not provided because of plaintiff's previous use of one to pick at his wrist. *Id*., at 43. Ten days later, plaintiff again flooded his cell by damaging the fire suppression system, claiming he had done it because it was the only way he could get to speak with a sergeant about his complaint that he had not been fed. Ex. A, Attach. 1, at 49-55. Plaintiff had refused the dinner tray offered because he believed it had an "incomplete portion" of food, and an officer had refused to provide a different tray. *Id*., at 51; Ex. B, at 188-89. Plaintiff again had to be admitted to the CTC because of his threat to hurt himself. *Id*. Dr. Dennis found that plaintiff's self-harm claims were his way of proving his belief that staff were mistreating him. *Id*. Dr. Dennis concluded that plaintiff was psychopathic and using mental health services for secondary gain in order to gain preferential housing or a transfer to EOP, even though he had no Axis I serious mental disorder. *Id*., at 200. Staff noted that he would say whatever he needed to say to get his way. *Id*.

In early April 2005, mental health staff noted that plaintiff was easily agitated, demanding, and asking officers for things every time he saw them, and that he had threatened to kill a sergeant if he did not get his property in two days. Ex. B, at 210. He was told that if he calmed down, he would get some property that day and the rest the following day. *Id*. Dr. Riddle saw him and noted that custody staff were concerned about his paranoia and anger when he was released from suicide follow up. *Id*.

Plaintiff subsequently sent a letter to the warden claiming that he was concerned for his safety if he were housed in Facility D; but when staff investigated those concerns, he again could not identify any particular inmate who was a threat. Ex. A, Attach. 2, at 1. Staff noted that an inmate plaintiff considered to be a friend had sent him letters advising him that inmates on his tier were upset because of his disruptive behavior. *Id*. Staff concluded that the letters simply told plaintiff how they felt and asked that he change his behavior. *Id*. The letters were not

viewed as threats.  *Id.*

The next day, plaintiff again refused to return his dinner tray unless he could talk to a sergeant about property issues. Ex. A, Attach. 1, at 65-71.  A few days later, plaintiff ranted to mental health staff about perceived injustices and disrespect by staff and threatened to hurt them. Ex. B, at 219.  Staff were warned to be careful around him.  *Id.*  The previous day, plaintiff had complained that medical staff had not given him a physical which he claimed he needed.  Ex. B, at 215-16.

On April 27, 2005, plaintiff refused to return his dinner tray and began kicking his cell door because he thought his serving of turkey was smaller than that provided to other inmates. Ex. A, Attach. 1, at 73-80.  The following day, plaintiff was placed in administrative segregation because he said he had received "kites" from other inmates asking him why he was "always fucking with the police" and telling him that he had other inmates "hating him." Ex. A, Attach. 2, at 5-6.  One kite warned him that when the inmates came off lockdown, plaintiff would be knocked "in the dam [sic] head" for "talking shit" to other inmates and that he had better watch himself.  *Id*., at 6.  The authors of the kites were not identified.  *Id*., at 5-6.  Staff reported that plaintiff had made disrespectful statements to inmates of every race on his tier and that because of the kites and other information they had obtained.  *Id.*  Staff concluded that he would be targeted for assault, if he returned to Facility D.  *Id*., at 2.  As a result, staff recommended that he be retained in administrative segregation pending transfer to another institution.  *Id.*

Plaintiff was placed in administrative segregation on walk-alone status as a result of the safety concerns.  Ex. A, Attach. 1, at 81.  Plaintiff then told mental health staff that he was depressed and wanted psychiatric medications.  Ex. B, at 235.  Dr. Dahl and other clinicians doubted his reports, found that he was medication-seeking, and did not prescribe it.  *Id*.  Dr. Abrams also found that plaintiff did not have an Axis I mental illness for which medication was indicated, when he saw him in August 2005. Ex. B, at 362.

////

1    By September 2005, plaintiff was demanding medication to "take the edge off."  Ex. B, at

2    379.  However, a psychiatrist concluded that medications were not indicated because there were

3    no specific target symptoms.  *Id.*, at 378.  At plaintiff's request, he was seen for a second opinion

4    by another psychiatrist a few days later.  Ex. B, at 381.  That psychiatrist also found that he did

5    not have an Axis I mental disorder, that he refused to take responsibility for any of his actions or

6    problems, and that medication was not indicated.  *Id.*

7    Plaintiff continued to complain that he needed medication to "take the edge off."  Ex. B,

8    at 397, 399, 402.  In November 2005, mental health staff found that a low dose of medication

9    might be helpful to treat his paranoia, but plaintiff refused the medication offered.  Ex. B, at 412.

10   Two months later, a psychiatrist diagnosed plaintiff with hypomania and prescribed Keppra.  Ex.

11   B, at 442-43.  Plaintiff, however, continued to argue with everyone who tried to speak with him

12   and be paranoid.  *Id.*, at 444-45.

13   In February 2006, a psychiatrist discontinued the Keppra, noting that plaintiff would not

14   change his behavior, and refused to order an antidepressant that plaintiff requested to "help him

15   sleep."  Ex. B, at 464-65, 467.  Plaintiff transferred from HDSP a few weeks later.  Ex. A,

16   Attach. 1, at 174.

17   **B.  Medical Care Given to Plaintiff at HDSP**

18   When plaintiff arrived at HDSP in November 2003, he was seen and treated for a

19   possible sinus infection and chest wall discomfort.  Ex. B, Attach. 1, at 4.  He was seen by a

20   doctor in February and April for a complaint of weight loss.  *Id.*, at 7.  Diagnostic tests were

21   normal, and plaintiff's request for a complete physical was denied.  *Id.*, at 9.  Medication for low

22   back pain associated with bullet fragments from an old gunshot wound was ordered.  *Id.*

23   After plaintiff had a fight with his cellmate in June 2004, doctors treated him for a thumb

24   fracture that required surgery.  Ex. B, Attach. 1, at 11-26.  The following month, plaintiff asked

25   mental health staff to see medical staff for problems with his fractured thumb.  Ex. B, Attach. 1,

26   at 36-51.  Medical staff saw him and reported that, against their advice, he was removing the

1   surgical dressing and handling the pins used to fix the fracture, which put him at risk for

2   infection.  *Id.*, at 39, 43.   An orthopedic surgeon saw plaintiff in August 2004 and noted that he

3   had removed one of the pins himself, but that two others were in place, and that the fracture was

4   healing with no sign of infection.  *Id.*, at 51.  The remaining pins were removed two months

5   later, a splint was provided to protect the thumb, and range-of-motion exercises were ordered.

6   *Id.*, at 54.

7        Plaintiff subsequently complained of other medical problems, but when a nurse saw

8   him, he could not remember them in any detail and simply said he "did not feel right."  Ex. B,

9   Attach. 1, at 56-57.  Plaintiff later said most of those problems had resolved themselves after he

10  was placed in a single cell.  *Id.*, at 58.

11       When seen for follow up on his thumb fracture in November 2004, plaintiff complained

12  of chronic constipation and chronic mild pain for which fiber tablets and ibuprofen were ordered.

13  *Id.*  Plaintiff again asked to have a complete physical, but was told that one would not be ordered

14  and that his medical problems would be addressed as they arose.  *Id.*  In December 2004, the

15  surgeon found that plaintiff's thumb fracture was healed, that he had almost full range of motion,

16  and that plaintiff was told to request follow-up with prison doctors if he had discomfort or range

17  of motion decreased.  *Id.*, at 59-61.

18       On December 30, 2004, plaintiff told mental health staff that he couldn't find a cellmate

19  with whom he was compatible and that he had been placed on lockdown following a fight with

20  his cellmate that left him with loose teeth.  Ex. B, Attach. 1, at 62.  He saw a dentist a few days

21  later, but reported that teeth had come loose on two different days, one of which was before the

22  December 30 fight.  *Id.*, at 63.  The dentist found that one tooth had no periodontal attachment

23  and the other had hopeless periodontitis, so both teeth were extracted.  Ex. C, Attach. 1, at 4.

24       In early February 2005, Plaintiff asked to see a doctor and again said he needed a

25  complete physical.  Ex. B, Attach. 1, at 69.  He was seen the following day and complained that

26  he had a migraine headache, burning on urination, gas, constipation, and diarrhea that he

believed was caused by officers were "putting something in his food."  *Id*., at 70.  An examination and tests found no problems, and he was told not to overuse ibuprofen and Tylenol.  *Id*.  About three weeks later, while plaintiff was in the CTC for suicidal ideation, a history and physical was done that found no problems, except for his psychiatric disorder.  *Id*., at 71.

In April 2005, plaintiff complained of blurred vision and was scheduled for an optometry examination.  Ex. B, at 188-207.  He was diagnosed with hyperopic presbyopia for which bifocals were provided.  *Id*., at 237, 362.

On April 20, 2005, plaintiff complained that he had not had a complete physical since his arrival at HDSP and asked to be tested for colon cancer.  Ex. B, at 215-16.  When he was seen by a nurse the next day, he complained of back pain that was improved by lying on his back.  *Id*., at 218.  X-rays and medication refills were ordered.  *Id*.

Medical staff continued to see plaintiff for follow up on various complaints, which usually concerned chronic back pain, bowel problems, allergies, and foot or eye problems for which treatment was provided.  Ex. B, at 220-73.  By early August 2005, mental health staff reported that he was asking them to refer him to be seen by a doctor almost every day.  *Id*., at 341-47.

Medical staff continued to see and provide treatment to plaintiff for complaints of urine and bowel problems, chronic back pain, and eye problems.  *Id*., at 350-52, 355, 364, 387.  In October 2005, a dentist found that plaintiff had severe periodontitis, extracted a number of teeth, and ordered dentures.  Ex. 3, Attach. 1, at 3-4.

In November 2005, plaintiff complained to mental health staff of tightness in his stomach and chest and that he believed staff were poisoning his food.  Ex. B, at 419.  Medical staff did not order treatment.  *Id*.

Plaintiff continued to file numerous requests for medical care that were referred to medical staff who saw and treated him.  Ex. B, at 425-57.  In February 2006, a doctor noted that he had a bullet fragment in his upper sacrum and degenerative disc disease at L5-S1, but his

request for a medical chrono that he not lie on his abdomen was denied.  *Id*., at 459.  Plaintiff

was also referred to the dentist who extracted another tooth because of periodontitis and refined

his bite blocks.  Ex. C, Attach. 1, at 3.  Plaintiff subsequently complained that he had not

received medications that had been ordered, but a nurse reported that he had received the ones

ordered, and that another had not been ordered as he claimed.  Ex. B, at 463.

### C.  December 30, 2004, Incident with Officer Cook

On December 30, 2004, plaintiff told a psychiatric social worker that he had loose teeth

because of a fight with his cellmate.  Ex. B, Attach. 1, at 62.  However, when seen by the dentist

a few days later, he said the teeth had become loose on two different days, one of which was

before the December 30 fight.  *Id*., at 63.  Officer Cook denied that the teeth became loose

because he ran plaintiff into a wall on December 30.  Ex. C, at 4; Am. Compl. at ¶ 4.

### D.  April 28, 2005, Incident with Officer Hook

On April 28, 2005, plaintiff was placed in administrative segregation for his own safety

after he reported receiving "kites" asking him why he was "always fucking with the police" and

stating that he had all the inmates "hating him."  Ex. A, Attach. 2, at 2-6.  The kites said he

should stop "acting crazy" and that he had "better do something for himself" or he would be

"knocked in his dam [sic] head" when the inmates came off lockdown.  *Id*.  Staff investigated

and found that plaintiff had made disrespectful statements to inmates of all races on his housing

tier and that he would be targeted for assault, if he returned to Facility D.  *Id*., at 2.  Staff

recommended that he be retained in administrative segregation until transfer to another

institution.  *Id*.

Officer Hook did not tell other inmates that day that plaintiff had a conviction for a

sexual offense  with a minor, that he had an "R" suffix, or that he was a "snitch."  Defs.' Ans. at

¶ 4 [Clerk's Record 20].

////

////

### E.  August 27 and 28, 2005, Incident with Officers Hook and Essman and Sergeant Perry

Plaintiff claims that Officer Hook gave him a dinner tray on August 27, 2005, that had only two pieces of chicken, that there was a hair in the noodles, and that some gravy had gotten on his cake.  Compl., at 4 of 18.  Officers Hook refused to give him a different tray, and Officer Essman and Sergeant Perry failed to correct the problem.  *Id*.  Plaintiff did not eat the food provided and claimed he suffered hunger pangs.  *Id*.

Around 3:00 a.m. the next morning, Officer Hook noticed that plaintiff had covered his bunk with sheets and blankets so that officers could not see him.  Ex. A, Attach. 1, at 119, 127.  Officer Hook banged on the door, and ordered plaintiff to show himself for count, but he did not respond.  *Id*.  A cell extraction team had to enter the cell to remove him.  *Id*.  During the extraction, Officer Hook placed a shield on plaintiff.  *Id*.  When plaintiff was ordered to roll on his stomach and place his hands behind his back so restraints could be applied, he swung his arms and legs and force had to be used.  *Id*.  Officer Lysiak applied the handcuffs.  *Id.*  Plaintiff threatened to kill the officers and said it would not have happened if he had been fed.  *Id*.  After being removed from the cell, he was examined by medical staff who found no visible injuries.  *Id*.

Although plaintiff claimed that he was at risk because Officer Hook had told other inmates that he had a conviction for a sexual offense involving a minor and was a "snitch," Hook denied doing so, and plaintiff's prison records show that his disrespectful behavior toward other inmates was the reason he was at risk.  Ex. A, Attach. 2, at 2-6, 49-50; Defs.' Ans. at ¶ 4 [Clerk's Record 20].

### F.  Alleged Sexual Harassment and Use of Force by Officer Doyle

Plaintiff claims that Officer Doyle used unnecessary force by yanking his elbow out of the food port when handcuffing him for an escort to a psychiatric interview, holding the chain tightly during the escort, and pushing him down stairs causing pain to his lower back during four

1  escorts from July to October 13, 2005.  Compl. p. 24 of 65.  Plaintiff further claimed that Officer

2  Doyle pressed his body close to his in a "sexual manner," blew kisses to him, and called him a

3  "huckleberry, sweet thang" during an escort on October 13, 2005.  *Id.*  Officer Doyle and other

4  defendants, who were present, deny that this happened.  Defs.' Ans., at ¶ 4.  Plaintiff's grievance

5  was denied on the ground that the charges against Officer Doyle were not proven.  Ex. A, Attach.

6  1, at 110-117.  Plaintiff's medical reports, including one two days after the alleged October 13,

7  2005, incident, contain no reports of injuries caused by Officer Doyle's alleged conduct.  Ex. A,

8  Attach. 1, at 108, 151-54; Ex. B, at 275-78, 299-301.

9  **II.  Summary Judgment Standards Under Rule 56**

10         Summary judgment is appropriate when it is demonstrated that there exists "no genuine

11  issue as to any material fact and that the moving party is entitled to a judgment as a matter of

12  law." Fed. R. Civ. P. 56(c).

13              Under summary judgment practice, the moving party
               always bears the initial responsibility of informing the district
14             court of the basis for its motion, and identifying those portions of
               "the pleadings, depositions, answers to interrogatories, and
15             admissions on file, together with the affidavits, if any," which it
               believes demonstrate the absence of a genuine issue of material
16             fact.

17  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

18  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

19  judgment motion may properly be made in reliance solely on the 'pleadings, depositions,

20  answers to interrogatories, and admissions on file.'"  *Id.*  Indeed, summary judgment should be

21  entered, after adequate time for discovery and upon motion, against a party who fails to make a

22  showing sufficient to establish the existence of an element essential to that party's case, and on

23  which that party will bear the burden of proof at trial.  *See id.* at 322.  "[A] complete failure of

24  proof concerning an essential element of the nonmoving party's case necessarily renders all

25  other facts immaterial." *Id.*  In such a circumstance, summary judgment should be granted, "so

26  long as whatever is before the district court demonstrates that the standard for entry of summary

1    judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

2          If the moving party meets its initial responsibility, the burden then shifts to the opposing

3    party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita*

4    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

5    existence of this factual dispute, the opposing party may not rely upon the allegations or denials

6    of its pleadings but is required to tender evidence of specific facts in the form of affidavits,

7    and/or admissible discovery material, in support of its contention that the dispute exists. *See*

8    Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party must demonstrate

9    that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under

10   the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec.*

11   *Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

12   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

13   nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

14         In the endeavor to establish the existence of a factual dispute, the opposing party need not

15   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed

16   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

17   truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to

18   'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

19   trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on

20   1963 amendments).

21         In resolving the summary judgment motion, the court examines the pleadings,

22   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed. *See Anderson*,

24   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

25   court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587.

26   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

On April 12, 2005, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc),  *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

**III.    Analysis**

**A.  Mental and Physical Health Care Claims**

Plaintiff claims that defendants were deliberately indifferent to his mental and physical health care needs in violation of the Eighth Amendment.  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.' " *Hudson v. MacMillian*, 503 U.S. 1, __, 112 S.Ct. 995, 1000.  A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  *Gamble*, 429 U.S. at 104, 97 S.Ct. at 291.  Either result is not the type of "routine discomfort [that] is 'part of the penalty that criminal offenders pay for their offenses against society.' " *Hudson*, 503 U.S. at __, 112 S.Ct. at 1000 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and

1   substantial pain are examples of indications that a prisoner has a "serious" need for medical

2   treatment.  *See, e.g., Wood v. Housewright,* 900 F.2d 1332, 1337-41 (9th Cir.1990) (citing

3   cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200-01 (9th Cir.1989).

4          Negligence is not enough for liability under the Eighth Amendment.  *Farmer*, 511 U.S. at

5   835-36 & n4.  An official's failure to alleviate a significant risk that he should have perceived

6   but did not, . . . cannot under our cases be condemned as the infliction of punishment."  *Id*. at

7   838.  Instead, "the official's conduct must have been 'wanton,' which turns not upon its effect on

8   the prisoner, but rather, upon the constraints facing the official."  *Frost v. Agnos*, 152 F.3d 1124,

9   1128 (9th Cir. 1998) (citing *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)).  Prison officials

10  violate their constitutional obligation only by "intentionally denying or delaying access to

11  medical care."  *Estelle*, 429 U.S. at 104-05.

12         Prison officials violate the Eighth Amendment when they engage in "acts or omissions

13  sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v.

14  Gamble*, 429 U.S. 97, 106 (1976).  A prison official is deliberately indifferent when he knows of

15  and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate."

16  *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

17  The official must "be aware of the facts from which the inference could be drawn that a

18  substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S.

19  at 837.

20         Deliberate indifference "may be manifested in two ways.  It may appear when prison

21  officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the

22  way in which prison physicians provide medical care."  *Hutchinson v. United States*, 838 F.2d

23  390, 394 (9th Cir. 1988).  When prison medical personnel act based on "a medical judgment that

24  either of two alternative courses of treatment would be medically acceptable under the

25  circumstances, plaintiff has failed to show deliberate indifference, as a matter of law."  *Jackson

26  v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996).  Prison officials provide constitutionally

inadequate care when they know that a particular course of treatment is ineffective, but they do not alter it in an attempt to improve treatment." *See Jett v. Penner*, 439 F.3d 1091, 1097-1098 (9th Cir. 2006). A medical need is serious if failure to treat the condition could cause further significant injury or the unnecessary and wanton infliction of pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). Unnecessary continuation of pain may constitute the "harm" necessary to establish an Eighth Amendment violation from delay in providing medical care. *Id.* at 1062.

Plaintiff claims that defendants Abrams, Dahl, Dennis, Riddle, and Thomas did not provide him with his preferred course of treatment for his mental health disorder, or failed to refer him to medical staff for treatment of his medical problems. Plaintiff argues that he wanted to receive a prescription for Prozac or other antidepressants, which defendants refused to provide. Defendants argue that plaintiff's claims should be dismissed because plaintiff was in fact treated for his mental illness and simply disagrees with his mental health care providers as to the course of treatment provided. Defendants have adduced copious evidence that plaintiff has received continuous and thoughtful care, deriving second and even third opinions from his treating physicians who were all in agreement that plaintiff did not require antidepressants for his treatment.

Plaintiff's difference of opinion as to what the true nature of his mental illness is and how to treat it does not state a claim under the Eighth Amendment. Plaintiff is not a doctor and adduces no evidence to support that his preferred course of treatment with Prozac or other antidepressants was the only adequate course.

Plaintiff's claim that defendants were deliberately indifferent to his medical needs for his physical ailments is likewise baseless. The record is rife with evidence that plaintiff received ongoing treatments for constipation, low back pain, and periodontitis. Indeed, despite concerns that plaintiff may be malingering, the facts show that defendants maintained a responsive routine of examination and appropriate medical care each time plaintiff called upon them to do so.

1    Plaintiff has failed to demonstrate that the various medical visits he participated in to treat his

2    various health complaints were deficient in any way.  Far from deliberate indifference, the facts

3    show that plaintiff received a competent and professional level of care rendered by concerned

4    physicians.

5        Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to his

6    Eighth Amendment claims, and the court therefore recommends that defendants' motion for

7    summary judgment be granted in this regard.

8        **B.  Defendant Cook – Excessive Force and Sexual Harassment**

9        Plaintiff complains that defendant Cook smashed plaintiff's head into a wall on

10   December 30, 2004, loosening his teeth, then later came to plaintiff's cell, blew kisses at him,

11   and said that he would knock out the rest of plaintiff's teeth so plaintiff could be his "service

12   bitch."  Compl., at 7.  Defendant Cook argues that he is entitled to summary judgment on this

13   claim because there is no evidence that any of this is true.  He argues that plaintiff is paranoid

14   and delusional in his belief that officers are persecuting him, and he told mental health staff that

15   his teeth were loosened during a fight with his cellmate.

16       When a prison official stands accused of using excessive physical force in violation of

17   the cruel and unusual punishment clause of the Eighth Amendment, the question turns on

18   whether force was applied in a good faith effort to maintain or restore discipline, or maliciously

19   and sadistically for the purpose of causing harm.  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  In

20   determining whether the use of force was wanton and unnecessary, it is proper to consider

21   factors such as the need for application of force, the relationship between the need and the

22   amount of force used, the threat reasonably perceived by the responsible officials, and any

23   efforts made to temper the severity of the forceful response.  *Hudson*, 503 U.S. at 7.

24       Plaintiff's own factual allegations in support of his excessive force claim are in conflict.

25   Plaintiff told staff that his teeth were loosened in a fight with his cellmate.  Plaintiff has a long

26   history, documented in the record before the court, of battling with his cellmates.  Plaintiff also

1    has a well-documented medical history of periodontitis.  These facts, taken in consideration with

2    plaintiff's inconsistent factual statements and the fact that he also has an established history of

3    treatment for paranoia and delusion, render his claim implausible.  "If the factual context makes

4    the non-moving party's claim implausible, that party must come forward with more persuasive

5    evidence than would otherwise be necessary to show that there is a genuine issue for trial."

6    *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468

7    (9th Cir. 1987) (citing  *Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. 574, 587 (1986)).  Plaintiff

8    has failed to come forward with any persuasive evidence as to this claim; therefore, the court

9    recommends granting defendant Cook summary judgment on this claim.

10          **C.  Defendant Hook – Excessive Force, Inadequate Nutrition, and Retaliation**

11          Plaintiff claims that defendant Hook used excessive force against him during a cell

12   extraction.  The facts before the court show that there was a need for the application of force as

13   plaintiff was hiding from officers and failed to respond, and plaintiff has a history of suicidal

14   behavior.  The facts show that defendants used the minimal amount of force necessary in

15   removing him from his cell, and consequently that plaintiff's subsequent medical examination

16   revealed no visible injuries.  Plaintiff has failed to demonstrate a genuine issue of material fact

17   for trial as to this claim.

18          Plaintiff claims that defendant Hook denied him adequate nutrition by refusing to give

19   him a different dinner tray on August 27, 2005, after he complained that his tray did not have

20   enough chicken on it, had a hair in the noodles, and the gravy was touching a piece of cake.

21   Plaintiff claims that as a result of this one instance of being served food that he found unsuitable,

22   he suffered hunger pangs.

23          To state a claim that the conditions of  imprisonment violate the Eighth Amendment

24   prohibition on cruel and unusual punishment, plaintiff must allege a specific individual was

25   deliberately indifferent to some basic human need such as food, clothing, shelter, medical care or

26   safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991); *Rhodes v. Chapman*, 452 U.S. 337,

347 (1981).  A prison official is deliberately indifferent when he knows of and disregards a risk

of injury or harm that "is not one that today's society chooses to tolerate."  *See Helling v.*

*McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Even if his assertions as to the food tray are true, plaintiff has only submitted evidence

that he found the meal served by defendant Hook inadequate.  He does not adduce any evidence

that defendant Hook was deliberately indifferent to his nutritional needs.  That defendant Hook

refused to exchange plaintiff's food tray for a different one does not rise to the level of a

constitutional violation.

Finally, plaintiff claims that defendant Hook exposed him to an unreasonable risk of

harm by telling inmates that he had a conviction for sexual offense with a minor and was a

"snitch."  Plaintiff has not produced any evidence in support of this allegation.  On the other

hand, defendants' evidence demonstrates that plaintiff was at risk because his disrespectful

behavior toward other inmates which made him a target, and for that reason plaintiff was placed

in administrative segregation for his protection.  Plaintiff has failed to present evidence on which

a reasonable fact finder could resolve this issue in his favor.  In short, he has not shown that

there is a genuine issue for trial.  *See California Architectural Bldg. Prods.,* 818 F.2d at 1468

(citing *Matsushita Elec. Indus. Co., Ltd.,* 475 U.S. at 587).

Therefore, the court recommends that defendant Hook's motion for summary judgment

be granted.

**D.  Officer Doyle – Excessive Force**

Plaintiff alleges that defendant Doyle yanked his arms through the food port when

handcuffing him, held his chains tightly, and pushed him on the stairs, causing pain to his lower

back, during escorts from July to October 13, 2005.  Compl., at 4.  He further claims that

defendants Beck, Dahl, Riddle, Minnick, and Gill were aware of this and did not report it.  *Id.*

Plaintiff also claims that defendant Doyle sexually harassed him on October 13, 2005, by

pressing his body close to his in a "sexual manner," held his chain tightly, blew kisses at him,

and called him "sweet thang, huckleberry." *Id.*

As with plaintiff's claims against defendant Cook, plaintiff's allegations against Doyle are unsubstantiated and made in the context of his delusional paranoia. He fails to present any evidence upon which a reasonable jury could render a verdict in his favor on these claims.

Plaintiff's allegations that Doyle used force causing pain in his lower back is likewise unsupported. Plaintiff has a history of low back pain and the injury he alleges here is *de minimis*. If Doyle used any force at all, there is no evidence that it rose to the level of a constitutional violation. There is no record that plaintiff sought medical treatment or complained of any injury as a result of Doyle's alleged slight use of force.

Based on the foregoing analysis, the court recommends that defendant Doyle's motion for summary judgment be granted on all claims.

Accordingly, IT IS HEREBY RECOMMENDED that defendants' August 13, 2007, motion for summary judgment be granted, and as this motion for summary judgment does not resolve all claims and defendants remain, the Clerk be directed not to enter judgment.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: February 13, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE